# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

*Mwt*

CHH

## NO. 2020 KJ 0929

## STATE OF LOUISIANA IN THE INTEREST OF T. B., JR.

*Judgment Rendered:* **FEB 1 9 2021**

* * * * * * * *

Appealed from the Juvenile Court
In and for the Parish of East Baton Rouge
State of Louisiana
Case No. JU114188

The Honorable Gail Grover, Judge Presiding

* * * * * * * *

| | |
|---|---|
| Bertha M. Hillman<br>Covington, Louisiana | Counsel for Appellant/Appellee<br>T.B., Jr. |
| Hillar C. Moore, III<br>District Attorney<br>Andrea "Andi" Neal<br>Assistant District Attorney<br>Baton Rouge, Louisiana | Counsel for Appellee/Appellant<br>State of Louisiana |

* * * * * * * *

BEFORE: THERIOT, WOLFE, AND HESTER, JJ.

*Wolfe, J. Concurs*

**THERIOT, J.**

The State of Louisiana filed a delinquency petition in case number 114188 against T.B., Jr.,[1] (hereafter referred to as "T.B.") a seventeen-year-old juvenile, based upon the alleged commission of two counts of armed robbery (counts one and two), violations of La. R.S. 14:64, and one count of illegal possession of a handgun by a juvenile (count three), a violation of La. R.S. 14:95.8. T.B. denied the allegations. The juvenile court denied T.B.'s motion to suppress global positioning system (GPS) records. Over the course of two separate adjudication hearing dates, the juvenile court entered judgments of acquittal finding T.B. not to be delinquent under counts 1 and 3, but adjudged T.B. to be delinquent as to count 2. After a disposition hearing, T.B. was committed to the Department of Public Safety and Corrections (DPSC) for twenty-four months. The juvenile court denied the State's motion to reconsider the disposition. T.B. now appeals, challenging the sufficiency of the evidence to support the adjudication and the juvenile court's denial of his motion to suppress GPS records. The State also appeals, challenging the juvenile court's denial of its motion to reconsider the disposition. After a thorough review of the record and the assignments of error, we affirm the adjudication and disposition.

## STATEMENT OF FACTS

On October 5, 2019, at about 10:30 p.m., Carley Davis encountered four young males near the Belle of Baton Rouge Casino and Hotel, while she was at a stop sign, and agreed to give them a ride. Davis testified that the youths were sitting outside of the hotel's administration building when she first spoke to them. Davis was driving at the time, and her friend, Asia Nguyen, was sitting in the front

---

[1] T.B.'s date of birth is October 8, 2002. He was sixteen years old at the time of the alleged offenses and seventeen years old when the petition was filed. As a minor, he will be referred to by his initials to ensure his confidentiality. See La. Ch. Code art. 412; Uniform Rules of Louisiana Courts of Appeal, Rule 5-2. The State also filed a petition against another minor, M.J., arising from the same incident. The proceedings in both cases were combined. M.J. filed a separate appeal in this court. See **State in Interest of M.J.**, 2020-0928 (La. App. 1st Cir. _/_/__), ___ So.3d ___.

passenger seat of the vehicle.[2] The youths asked for a ride to the Choctaw Drive and Scenic Highway area and agreed to give Davis money in exchange for the ride. During the ride, they told Davis that she could instead bring them to wherever she was going that night and that they would walk home from there. Davis decided to drop them off close to their home, as they were "kids," and she did not want them to be out, far from home. She allowed one of them to use her cell phone to call his mother. She took them to a side street behind a Dollar General Store located off Mohican Street and Plank Road and entered a parking lot. The youths were in Davis's vehicle for fifteen minutes or more.

Davis further testified that when they entered the parking lot of a business behind the Dollar General Store, she asked for the gas money, and the youths were hesitant to pay. Three of the youths exited her vehicle while one, unbeknownst to Davis, remained in the backseat, acting as if he were asleep. As Davis began to drive away, the three youths who exited the vehicle signaled for her to stop. One of the youths stated, "Hold on, my brother is in the car with you." Davis then turned around and realized that one of the youths was still in her vehicle. As Davis abruptly stopped her vehicle, one of the youths approached the passenger side of the vehicle, followed by another who approached the driver's door. The young male on the passenger side opened the door, put a gun to Nguyen's face, and snatched her bag. The other male opened Davis's door and pressed a gun against her left arm. He then leaned into the vehicle and snatched her purse from the floor by the driver's door and her cell phone that was connected to an auxiliary cord. The youths then fled the parking lot.

After initially driving away from the scene, Davis drove back to the scene to look for her belongings. She proceeded down Plank Road, in the direction that the youths were running when she last saw them and located them at a gas station at

---

[2] Davis's friend did not testify at the adjudication hearing. The record is inconsistent as to whether her last name was Nguyen or Naquin. Herein, we will use the last name most consistently used in the record, Nguyen.

Evangeline Street and Plank Road. Davis chased the four youths in her car in the parking lot. She followed them for about five blocks, exited her vehicle, and chased one of them on foot with a hammer. Davis testified that the individual she chased on foot was not in the courtroom at the time of the hearing, but she noted that he "kind of favors" M.J. and was dressed similarly. Davis was unable to catch up with the unidentified youth and immediately went back to her car when she heard one of the other youths fire their gun. Davis further testified that Nguyen called the police while Davis was driving.

On October 6, 2019, the day after the incident, Davis began tracking the location of her stolen cell phone and called the police after determining that her cell phone was at Spanish Arms Apartments (Spanish Arms), located at 4343 Denham Street, Baton Rouge, Louisiana.[3] Corporal David Bourque and Corporal J. Hollis of the Baton Rouge Police Department (BRPD) met Davis initially at the McDonald's next to Spanish Arms before proceeding to the apartment complex. About fifteen to thirty minutes after the officers responded, met with Davis, and unsuccessfully looked for her phone, Davis was contacted by someone she did not know who left her and Nguyen's phones at a gas station, a block away from the McDonald's and Spanish Arms. Davis went to the gas station and got both phones back. She noted that when she retrieved her cell phone, the name in the phone, under an email account, had been changed to "Munchie Jones."

Detective Justin Becnell with the BRPD was assigned to the case as the lead detective. Detective Becnell reviewed prior police reports including the original offense report submitted by BRPD Officer James Crockett, which included statements provided by the victims on the night of the initial complaint. According to Detective Becnell, a series of robberies occurred in the same area as the instant

---

[3] Davis specifically noted that she tracked her phone to the apartment complex during the early morning hours and that hours later, after she woke up that morning, she called the police to inform them that she had tracked her cell phone to that location.

incident. After reviewing police reports and conducting a query in a law enforcement database, Detective Becnell developed four suspects: M.J., his brother D.J., T.B., and J.J. M.J., D.J., and T.B. lived in Spanish Arms, and J.J. lived near the apartment complex. The apartment complex was less than a mile from the parking lot where the robbery took place.

In photographic lineups conducted on October 17, 2019, consisting of four separate six-person photo arrays, and, subsequently in court at the adjudication hearing, Davis identified M.J. as the person who approached her side of the vehicle and stole her items at gunpoint and identified T.B. as the person who approached and robbed Nguyen at gunpoint.[4] On October 24, M.J. and T.B. were arrested.

According to Detective Becnell, J.J. confessed to his involvement but named three other individuals as co-perpetrators who were not considered suspects in this case. However, at the adjudication hearing, J.J. testified that he did not recall his statement and that he had "[n]o memory" of this.

## T.B.'S FIRST ASSIGNMENT OF ERROR

In assignment of error number one, T.B. argues that Davis's identification was the result of a "suggestive procedure" that created a substantial likelihood of misidentification. T.B. concludes that because the identification was tainted, the evidence was insufficient to establish his identity as the perpetrator beyond a reasonable doubt. T.B. argues that he should be discharged due to the lack of sufficient evidence to support the adjudication. Citing **State v. Jones**, 94-1098 (La. App. 1st Cir. 06/23/95), 658 So.2d 307, writ denied, 95-2280 (La. 1/12/96), 666 So.2d 320,[5] T.B., alternatively, argues that this court should reverse the

---

[4] From the photographic lineup that contained a photo of D.J., Davis did not select the photograph of D.J. but instead selected a photograph of an unidentified male. Detective Becnell noted that the unidentified male had similar facial features and a similar hairstyle as D.J. Davis did not select anyone from the photographic lineup that included a photo of J.J.

[5] In **Jones**, an undercover narcotics agent identified the defendant in a pre-trial single photographic identification. Based on the circumstances presented therein, this court held, "[t]he likelihood of misidentification present in this case denied defendant his right to due process." **Jones**, 658 So.2d at 312. Thus, we remanded the case to the trial court for retrial, instructing the district attorney's office to "determine in good faith

adjudication and remand for a new adjudication hearing without the out-of-court and in-court identification or the GPS records challenged in his second assignment of error.

T.B. alleges that Davis conducted her own social media investigation and claims that Davis and Nguyen could not describe the youthful perpetrators without looking at their cell phones. He further claims that Davis contacted the police on the morning after the robbery to report that she saw T.B. and M.J. on the balcony of apartment 908, M.J.'s mother's apartment, at Spanish Arms, but when the police arrived at the apartment, T.B. and M.J. were not there. Noting that Davis incorrectly identified one suspect and could not identify another, T.B. maintains, "it appears that [Davis] could only identify the youths whose photographs she had previously seen on [I]nstagram." T.B. contends that it is likely that the three males named by J.J. as co-perpetrators were the actual perpetrators in this case. He notes that M.J. was mistakenly identified as a perpetrator in one of the other robberies in the area.

T.B. contends that this court is required to determine the reliability of the photographic lineup according to the factors set forth in **Manson v. Brathwaite**, 432 U.S. 98, 114-15, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), which include: 1) the opportunity of the witness to view the criminal at the time of the crime, 2) the witness' degree of attention, 3) the accuracy of the prior description of the criminal, 4) the level of certainty demonstrated at the confrontation, and 5) the time between the crime and the confrontation.[6] T.B. argues the incident took place at

---

whether sufficient evidence can be produced to warrant a retrial, absent the tainted identifications." **Jones**, 658 So.2d at 313.

[6] T.B.'s written motion to suppress "all the illegitimately gained evidence," which he identifies as GPS records and a post-arrest statement, does not specifically challenge the identification evidence. However, the transcript of the hearing reflects that T.B. orally joined in M.J.'s written motion to suppress identification. Further, written motions by co-defendants are presumed to have been made on behalf of all defendants unless the contrary appears. La. Code Crim. P. art. 842; **State v. Weary**, 2003-3067 (La. 4/24/06), 931 So.2d 297, 315, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006). While T.B. does not directly challenge on appeal the denial of the motion to suppress identification, he relies on **Manson** and **Jones** in arguing that a due process violation occurred as a result of the admission of the identifications. Thus, we will conduct a **Brathwaite** analysis in addressing T.B.'s due process argument. See **State v. Bowie**, 2017-1762 (La. App. 1st Cir. 6/1/18), 2018 WL 2453480, at *3, writ denied, 2018-

night and argues Davis could not have had an opportunity to view the youths. He also contends that since Davis was driving, she was unable to pay attention to the youths. He notes that Davis only described the offenders as young black males between fourteen and eighteen years old. He argues that while Davis was certain that she saw him and M.J. on Instagram, there was no evidence that the Instagram photographs were photographs of the robbers. T.B. again notes that Davis misidentified one of the suspects in the lineup. Regarding the final factor, T.B. asserts that Davis had the Instagram photograph eleven days before the lineup and four months before the in-court identification. He argues that the corruptive effect of the initial suggestive procedure tainted the in-court identification.

In a juvenile adjudication proceeding, the State must prove beyond a reasonable doubt that the child committed a delinquent act alleged in the petition. La. Ch. Code art. 883. The burden of proof, beyond a reasonable doubt, is no less severe than the burden of proof required in an adult proceeding. **State in Interest of D.L., Jr.,** 2017-0891 (La. App. 1st Cir. 11/1/17), 233 So.3d 671, 676. Accordingly, in delinquency cases, the standard of review for the sufficiency of evidence is that enunciated in **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), i.e., whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the State proved the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must

1099 (La. 1/8/19), 260 So.3d 1214; **State in Interest of C.T.H.,** 2011-1904 (La. App. 1st Cir. 9/21/12), 2012 WL 4335395, at *6-7; Cf. **State in Interest of D.P.,** 2018-1431 (La. App. 1st Cir. 2/28/19), 2019 WL 968056, at *2 n.2; **State v. Washington,** 2012-0401 (La. App. 1st Cir. 11/2/12), 2012 WL 5387400, at *2.

exclude every reasonable hypothesis of innocence. **State ex rel. D.F.**, 2008-0182 (La. App. 1st Cir. 6/6/08), 991 So.2d 1082, 1085, writ denied, 2008-1540 (La. 3/27/09), 5 So.3d 138.

Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64(A). The State bears the burden of proving the elements of the charged offense, as well as the identity of the defendant as the perpetrator. See **State v. Draughn**, 2005-1825 (La. 1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). The testimony of the victim alone is sufficient to prove the elements of the offense. **State v. White**, 2016-0611 (La. App. 1st Cir. 10/28/16), 206 So.3d 387, 391. Here, T.B. does not argue the State failed to prove a crime occurred, but rather contends his identity as one of the perpetrators was not proven beyond a reasonable doubt.

When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. **White**, 206 So.3d at 391. The trier of fact, in this case, the juvenile court, is charged with making credibility determinations. Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. In the absence of internal contradictions and irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support an adjudication. See **State in Interest of T.C.**, 2018-1246 (La. App. 1st Cir. 12/21/18), 269 So.3d 716, 719.

8

An identification procedure is suggestive if, during the procedure, the witness's attention is unduly focused on the defendant. **State in Interest of E.R.,** 2009-0756 (La. App. 1st Cir. 12/23/09), 2009 WL 4981461, at *3. The question for a reviewing court is whether the procedure is so conducive to irreparable misidentification that due process was denied. **State v. Bright**, 98-0398 (La. 4/11/00), 776 So.2d 1134, 1145; **State v. McKinley**, 2010-1515 (La. App. 1st Cir. 3/25/11), 2011 WL 1103394, at *4. Even if the identification could be considered to be suggestive, that alone does not indicate a violation of the accused's right to due process. It is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure. **C.T.H.,** 2012 WL 4335395 at *6. Thus, even when suggestiveness of the identification process is proven by the defendant or presumed by the court, the defendant must also show there was a substantial likelihood of misidentification as a result of the identification procedure. **E.R.,** 2009 WL 4981461, at *3.

Because a review of the law and facts in a juvenile delinquency proceeding is constitutionally mandated, an appellate court must review the record to determine if the juvenile court was clearly wrong in its factual findings. See La. Const. art. 5, § 10; **T.C.,** 269 So.3d at 719. In a juvenile case, when there is evidence before the trier of fact that, upon its reasonable evaluation of credibility, furnished a factual basis for its finding, on review, the appellate court should not disturb this factual finding in the absence of manifest error. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. **State in Interest of D.M.,** 2017-1418 (La. App. 1st Cir. 2/21/18), 2018 WL 1007352, at *3.

At the adjudication hearing herein, Corporal Bourque confirmed that when he responded to the McDonald's located on Plank Road, the day after the incident in question, he asked the victims for a description of the perpetrators. At that

9

point, the victims attempted to show him photographs on their phones. However, Corporal Bourque noted that he did not look at the photographs, as he wanted to be sure that he was given descriptions based on the victims' memories from the night in question. Corporal Bourque further testified that the victims informed him that when they drove through Spanish Arms, prior to contacting the police, some "guys" were sitting outside of an apartment and that one of them committed the robberies in question. Corporal Hollis similarly testified that they were advised that there were individuals outside of apartment 908 who possibly fit the description of the robbers.

When the officers went to Spanish Arms, two males were sitting on the balcony outside of apartment 908. After seeing the individuals on the balcony, the officers entered the apartment and made contact with M.J.'s mother, and two males present at the time.[7] M.J.'s mother indicated that M.J. was not there.[8] Corporal Bourque noted that he next went to T.B.'s mother's apartment and that T.B. was home at the time. The officers were unable to locate Davis's cell phone. Corporal Bourque further testified regarding the identity of the two males who were on the balcony when the police arrived. While he identified one of the individuals by name, the named individual was not identified as being involved in the instant case. He testified that the other individual left before he could get his name. When asked if he recalled how the unnamed individual looked, Corporal Bourque testified, "It look[s] like him[9] right there." Corporal Bourque confirmed that an in-person lineup was not conducted.

As a part of his investigation, Detective Becnell contacted the Department of Juvenile Services (DJS) and learned that T.B. was equipped with a GPS bracelet

[7] Corporal Bourque initially indicated that D.J. was home at the time. However, on cross-examination, he agreed that he was mistaken after the defense counsel told him that his report indicated that D.J. was not present at the apartment.

[8] Corporal Bourque testified that he did not know M.J. but did ask around for him.

[9] The record does not confirm whether Corporal Bourque was referring to one of the juvenile defendants in this case.

around his ankle due to a previous legal matter and requested a GPS data report.[10] Detective Becnell confirmed that J.J. confessed after his arrest but named three other individuals as co-perpetrators who were not considered suspects in this case, including a set of twins whose initials were both J.C. Detective Becnell testified that the names provided by J.J. were inconsistent with the information provided by Davis.

Detective Becnell further confirmed that the BRPD attempted to ascertain whether the individuals named by J.J. were involved in this case but found no evidence to suggest that they were involved. Detective Becnell noted that the twins were present at Spanish Arms at the time of the arrest of the suspects in this case and/or the execution of the search warrants. He noted that T.B. was much larger and taller than the twin brothers, and that T.B.'s hair was clearly distinguishable, as it came over his eyes and face. He also noted that M.J. "was more of a heavier set build." He mentioned other discrepancies including "drastic differences" in appearances, stating that the twins were thin and lean and muscular for their age but did not appear to have yet reached puberty. He noted that their skin tone was "a little bit darker" than M.J.'s skin tone. He described J.J. as a "smaller individual" and added, "He looks like a little boy still."

Davis testified that it was dark when she picked up the four youths on the night in question but confirmed that she was able to see them in her rearview mirror and noted that the route she drove had a lot of streetlights. Davis noted that during the car ride, one of the youths gave her an Instagram account name so that they could arrange to "hang out." She testified that she was "a very good multitasker" and contended that she kept her eyes on the youths and on the road for her safety. Davis also testified that while she did not know them personally, she

---

[10] T.B.'s probation officer, Rawley Harbison, confirmed that T.B.'s location activity report for the day in question did not show that he was home at the time of the offense but indicated that he was at an "unknown address."

had seen the four youths prior to the night in question at teen "parties and stuff."[11] Davis noted that when she arrived at the parking lot where the robberies took place, Nguyen rolled the passenger window down as they were talking to the youths after they exited her vehicle. She further testified that she was able to get a good look at both of the armed individuals who re-approached her vehicle. According to Davis's testimony, before M.J. approached her side of the vehicle, T.B. approached the passenger side of the vehicle and opened the passenger door. She added, "Then I look at him and see that the gun is pointing down in [Nguyen's] face." After Nguyen's bag was taken, M.J. opened Davis's door and pressed a gun against her left arm. She noted, "It was like 15 seconds back to back."

Davis indicated that based on her physical descriptions of the youths, she obtained their "government names" (as opposed to the nicknames she knew) from one or more persons who lived in the area where she believed they lived and obtained at least one group photograph of them before her phone was recovered.[12] Davis further testified that prior to meeting the police at McDonald's, she did not actually drive through or fully enter Spanish Arms. She noted that when she and Nguyen approached the entrance of the complex, they saw the males outside and that she and Nguyen turned and exited the complex immediately upon their entry, as they did not want to be seen by the individuals. She confirmed that on October 7, the day after she met with Corporal Bourque, she obtained additional photographs of the youths. She testified, "The next day I had my own pictures I got cause I knew what they looked like." Davis recalled participating in the photographic lineups conducted by Detective Forbes on October 17. Davis

---

[11] Davis further testified that she once lived in Spanish Arms.

[12] When asked how she described the individuals, Davis testified, "...how they looked together, looked alike. One was bigger than the other. One had a lot of hair and one was real smaller."

testified she was confident of her photographic lineup and in-court identifications of T.B. and M.J. as the youths who took their belongings.

At the adjudication hearing, J.J. confirmed his appearance in body-cam footage but repeatedly indicated that he did not recall any of his previous statements regarding the instant incident or previously naming any individuals. When asked if he had absolutely no memory of this, he stated, "No memory." As he continued to evade questioning, he began to repeatedly respond, "I plead the fifth."

At the outset, we note that in this case, the juvenile court was well aware of the method of identification used and could attach whatever weight it deemed appropriate. Since the defense of misidentification was urged at the adjudication hearing herein, the question of reliability was presented to the juvenile court for consideration. Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder. A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. **State in Interest of D.L.P.**, 2017-1148 (La. App. 1st Cir. 12/21/17), 240 So.3d 945, 949.

Moreover, based on our review of the record and consideration of the **Brathwaite** factors, we cannot say that the juvenile court was clearly wrong in its factual findings or credibility determinations. Unlike the situation before this court in **Jones**,[13] the victim in this case was not shown a single photograph of T.B., but instead selected T.B. and M.J. from two separate six-person, assembled photographic lineups. Davis testified that she was able to view the youths while they were in the backseat of her vehicle during the ride on the night in question.

---

[13] As this court noted in **Jones**, single-photograph identifications should be viewed in general with suspicion. **Jones**, 658 So.2d at 311.

13

She also noted that she and Nguyen put their windows down to talk to the youths while they were in the parking lot, prior to the robberies. Her testimony further indicates that she had a close-up view of both youths who approached her vehicle in the parking lot, armed with guns. She identified T.B. in court as the one who approached the passenger side of her vehicle and took Nguyen's bag at gunpoint. She noted that distance-wise, both individuals were an arm-length away, such that they were able to hold their guns up to Davis and Nguyen. While she may have provided general descriptions of the youths, the photographic lineup took place within two weeks of the incident. Further, Davis confirmed that she was confident that the two individuals she identified in the photo lineups and in court were the armed perpetrators.

While Davis sought and viewed other photos prior to the lineup, her testimony showed that her identification of T.B. and M.J. was independently based on her ability to closely view and interact with them on the night in question. Thus, even if we were to find that the identification was suggestive, T.B. failed to show a substantial likelihood of misidentification in this case. We find that the record supports the juvenile court's determination that the evidence negates any reasonable probability of misidentification. It is well settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. **C.T.H.**, 2012 WL 4335395 at *9. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence

14

that T.B. was guilty of armed robbery. Thus, after undertaking the constitutionally-mandated review of the law and facts, we find no manifest error by the juvenile court in its adjudication. This assignment of error lacks merit.

## T.B.'S SECOND ASSIGNMENT OF ERROR

In assignment of error number two, T.B. contends that the juvenile court erred in denying his motion to suppress evidence obtained from a GPS tracking device on his ankle, seized without a warrant, consent, or exigency. T.B. argues that the court order obtained by the State to allow for the GPS monitoring of his movements was not a substitute for a search warrant to obtain the GPS records at issue. T.B. notes that the United States Supreme Court has shown special solicitude for location information in the third-party context. He argues that the State invaded his reasonable expectation of privacy in the whole of his physical movements when it accessed his historical site location information. T.B. further argues that the data consisted of inadmissible hearsay, as the State did not call a representative from the company who generated the tracking information, B.I. Total Access. In that regard, T.B. argues that the trial court erred in allowing his probation officer, Rawley Harbison, to testify regarding the GPS tracking device, as Harbison could not determine where he was on the night in question and did not know if the GPS data was accurate or could be interfered with.

The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution protect persons against unreasonable searches and seizures. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. La. Code Crim. P. art. 703(A); **State in Interest of A.J.,** 2013-2108 (La. App. 1st Cir. 3/24/14), 2014 WL 1203210, at *2. The State bears the burden of proving the admissibility of the evidence seized without a warrant when the legality of a search or seizure is placed at issue by a motion to suppress evidence. La. Code Crim. P.

15

art. 703(D). A trial court's ruling on a motion to suppress the evidence is entitled to great weight, because the court had the opportunity to observe the witnesses and weigh the credibility of their testimony. **State v. Jones**, 2001-0908 (La. App. 1st Cir. 11/8/02), 835 So.2d 703, 706, writ denied, 2002-2989 (La. 4/21/03), 841 So.2d 791. When a trial court rules on a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence. See **State v. Green**, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-81. However, a trial court's legal findings are subject to a de novo standard of review. See **State v. Hunt**, 2009-1589 (La. 12/1/09), 25 So.3d 746, 751.

**Expectation of Privacy**

Federal and state constitutional protections against unreasonable searches exist only when an individual has an actual expectation of privacy that society is prepared to recognize as reasonable. **Katz v. United States**, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J. concurring); **State v. Ragsdale**, 381 So.2d 492, 497 (La. 1980); **State v. Pounds**, 2014-1063 (La. App. 1st Cir. 3/9/15), 166 So.3d 1037, 1039, writ denied, 2015-0696 (La. 2/19/16), 186 So.3d 1173. A parolee has a reduced expectation of privacy, subjecting him to reasonable warrantless searches of his person and residence by his parole officer. See **State v. Malone**, 403 So.2d 1234, 1238 (La. 1981). A probationer has essentially the same status as a parolee. **Malone**, 403 So.2d at 1238. The reduced expectation of privacy is a result of the probationer's conviction and agreement to report to a probation officer and to allow that officer to investigate his activities in order to confirm compliance with the provisions of his probation. See **State v. St. Cyre**, 2019-0034 (La. App. 1st Cir. 12/19/19), 292 So.3d 88, 97, writ denied, 2020-00142 (La. 5/26/20), 296 So.3d 1063.

## Hearsay

The adjudication hearing in delinquency proceedings shall be conducted according to the provisions of the Code of Evidence applicable to criminal cases. La. Ch. Code art. 881(A). Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered into evidence to prove the truth of the matter asserted. La. Code Evid. art. 801(C). Hearsay is not admissible except as otherwise provided by the Louisiana Code of Evidence or other legislation. La. Code Evid. art. 802. Thus, hearsay is inadmissible at adjudication hearings unless it falls under one of the enumerated statutory exceptions found in La. Code Evid. art. 803. Records may be admissible if they qualify as records of regularly conducted business activity. La. Code Evid. art. 803(6). Pursuant to La. Code Evid. art. 803(6), data compilations made and kept in the regular conduct of business activity, as shown by the testimony of a qualified witness, are admissible as an exception to the hearsay rule unless the circumstances of preparation indicate a lack of trustworthiness.

Article 803(6) provides, in pertinent part, as follows:

> **(6) Records of regularly conducted business activity.** A memorandum, report, record, or data compilation, in any form, including but not limited to that which is stored by the use of an optical disk imaging system, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. This exception is inapplicable unless the recorded information was furnished to the business either by a person who was routinely acting for the business in reporting the information or in circumstances under which the statement would not be excluded by the hearsay rule.

To exclude business records from the hearsay rule and render them admissible, Article 803(6) requires the court to determine from the testimony of either the

"custodian or other qualified witness" that: (1) the record was made at or near the time of the event; (2) the record was made either by, or from information transmitted by, a person with knowledge; (3) the record was made and kept in the course of a regularly conducted business activity; (4) it was the regular practice of that business activity to make and keep such records; (5) the recorded information was furnished to the business either (a) by a person who was routinely acting for the business in reporting the information; or (b) in circumstances under which the statement would not be excluded by the hearsay rule; and (6) neither sources of information nor the method or circumstances of preparation indicate a lack of trustworthiness. **State v. Pope**, 2017-0305 (La. App. 1st Cir. 9/15/17), 2017 WL 4082427, at *9, <u>writ denied</u>, 2017-1744 (La. 6/1/18), 243 So.3d 1064. The person who actually prepared the documents need not have testified, so long as other circumstantial evidence and testimony suggests their trustworthiness. **State v. Smith**, 2004-0800 (La. App. 1st Cir. 12/17/04), 897 So.2d 710, 715-16.

Herein, Detective Becnell testified that he requested a report of the data from the date of the instant incident. Upon his request, he received the report from DJS via electronic mail. Detective Becnell confirmed that he did not have a search warrant for the records or T.B.'s permission to obtain them.[14] T.B.'s probation officer, Harbison, testified that T.B. was under GPS monitoring at the time of the instant offenses. He testified that as standard practice, he receives via email a report from the probation manager regarding GPS monitor alerts that indicate whether the juvenile is leaving home after his assigned curfew, location data, the length of time or time frame at a location, and if or when the juvenile returns home. Harbison noted that the reports also provide a time frame for when a juvenile exceeds the range of the beacon. Harbison confirmed that as T.B.'s

---

[14] The defense attorney first argued the motion to suppress during his cross-examination of Detective Becnell regarding the records. At that time, the juvenile court noted that the GPS device was in place based on a court order. The court further noted that the records had not yet been offered into evidence and tentatively denied the motion, but held the motion open, noting that the defendant was not precluded from reasserting the issue.

probation officer, he kept the records showing T.B.'s GPS activity and that it was standard practice for all of his clients.

After Harbison viewed the report for the time frame of October 4, 2019 to October 7, 2019 and confirmed that it consisted of the same records that he kept in T.B.'s file, the State introduced the record into evidence. At that point, the defense attorney objected, asserting that Harbison did not work for B.I. Total Access, the monitoring company that compiled the data, and was unable to testify as to how the report was generated. The juvenile court ruled that the records were admissible under the business records exception to the hearsay rule. The court found that the State laid a foundation that the records were kept by the probation officer, a custodian or other qualified witness, as a regularly conducted activity.

We note that a probationer's freedom is conditioned by restrictions pursuant to the terms of his probation. **State v. Young**, 2007-988 (La. App. 5th Cir. 6/19/08), 988 So.2d 759, 763, writ denied, 2008-1599 (La. 3/27/09), 5 So.3d 139 (citing **U.S. v. LeBlanc**, 490 F.3d 361 (5th Cir. 2007)). "A State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry, likewise presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements." **LeBlanc**, 490 F.3d at 365 (quoting **Griffin v. Wisconsin**, 483 U.S. 868, 873-74, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987)).

As the Supreme Court further stated in **Griffin**, "[t]o a greater or lesser degree, it is always true of probationers ... that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special probation restrictions.'" **Griffin**, 483 U.S. at 874, 107 S.Ct. at 3169, (quoting **Morrissey v. Brewer**, 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). Supervision, then, is a "special need" of the State permitting a degree of impingement upon privacy that would not be

constitutional if applied to the public at large. **Griffin**, 483 U.S. at 875, 107 S.Ct. at 3169. Consequently, reasonable restrictions upon liberty and privacy are allowed and are necessary "to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." **LeBlanc**, 490 F.3d at 365-66 (quoting **Griffin**, 483 U.S. at 875, 107 S.Ct. at 3169).

Herein, T.B. was on ankle monitoring ordered as a condition of his probationary status and had no expectation of privacy as it related to the ankle monitor placed on him. Further, we agree with the juvenile court's finding that the GPS records qualify under the business records exception to the hearsay rule. As indicated during Harbison's testimony, the records were generated near and inclusive of the date of the event from information transmitted by a person with knowledge. The records were kept by the probation officer in the course of a regularly conducted business activity of the DJS; it was the regular practice of the probation officer to make and keep such records; and the recorded information was furnished by a company, B.I. Total Access, that routinely acted for the probation office in reporting the information. Finally, there was no indication of a lack of trustworthiness. Thus, T.B.'s second assignment of error lacks merit.

### STATE'S ASSIGNMENT OF ERROR

In its sole assignment of error, the State contends that the disposition in this case is illegally lenient and fails to address T.B.'s rehabilitative needs or the safety needs of the public. In arguing that twenty-four months is excessively lenient, the State notes that when T.B. committed the instant offense, he was already on probation for two delinquency adjudications for unauthorized use of a motor vehicle offenses for which he received a suspended commitment of two years in each case, to run concurrent. The State notes that as the juvenile court ordered that the twenty-four month disposition in this case would run concurrent to the others,

20

T.B. did not receive any additional time in DPSC custody to address his rehabilitative needs. The State notes that by the time T.B. was arrested for the instant offense, he had been arrested five times in the prior two years and six months and was no longer attending school. The State further notes that T.B. had been under the supervision of the DJS since April 26, 2019. Despite the interventions of DJS, T.B.'s probation officer, Harbison, noted that T.B.'s attitude indicated that he is likely to commit another offense and that he has shown no remorse.

The State contends that the juvenile court ignored DJS's recommendation that T.B. be committed to the DPSC for a period not to exceed his twenty-first birthday. The State argues that the juvenile court failed to recognize that a juvenile who committed armed robbery may need more time to be successfully rehabilitated and safely integrated into the community than those committing property or non-violent crimes. The State contends that prior DJS efforts to rehabilitate T.B. were unsuccessful, as T.B. escalated from unauthorized use of a motor vehicle to committing armed robbery. The State asks this court to adopt the disposition recommended by DJS that T.B. be committed to the Office of Juvenile Justice (OJJ) not to exceed his twenty-first birthday, or to alternatively remand this matter to the juvenile court and order it to adopt said recommendation.

Louisiana Children's Code article 897.1(C) provides as follows with regard to the adjudication of juvenile delinquency for the offense of armed robbery:

> After adjudication of a felony-grade delinquent act based upon a violation of R.S. 14:64, armed robbery, the court shall commit the child who is fourteen years of age or older at the time of the commission of the offense to the custody of the Department of Public Safety and Corrections to be confined in secure placement without benefit of probation or suspension of imposition or execution of sentence.

Louisiana Supreme Court jurisprudence indicates that Article 897.1 allows a juvenile court's discretion in determining the term of commitment to the custody

of OJJ of juveniles adjudicated guilty of armed robbery. See **State in the Interest of A.M.**, 98-2752 (La. 7/2/99), 739 So.2d 188, 190-91.[15] Under Louisiana Children's Code article 901(B), "[e]xcept as provided in Article 897.1, the court should impose the least restrictive disposition authorized by Articles 897 through 900 ... which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society." Under Louisiana Children's Code article 897(A)(1), after adjudication of any felony-grade delinquent act other than those described in Article 897.1, the juvenile court may "[r]eprimand and warn the child and release him into the custody of his parents either unconditionally or subject to such terms and conditions as deemed in the best interests of the child and the public."

Except as provided in Louisiana Children's Code article 897.1, commitment of the child to the custody of the DPSC may be appropriate under any of the following circumstances: (1) there is an undue risk that during the period of a suspended commitment or probation that the child will commit another crime; (2) the child is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment; (3) a lesser disposition will deprecate the seriousness of the child's delinquent act; or (4) the delinquent act involved the illegal carrying, use, or possession of a firearm. La. Ch. Code art. 901(C); **State in Interest of J.W.**, 95-1131 (La. App. 1st Cir. 2/23/96), 669 So.2d 584, 586, writ denied, 96-0689 (La. 4/26/96), 672 So.2d 911. The juvenile court's disposition should adequately address the circumstances of the case, the child's needs, and the best interest of society. See La. Ch. Code art. 901(B). A juvenile court is given wide discretion in imposing a disposition within statutory limits, and its disposition should not be set aside unless the court manifestly abuses that

---

[15] Although **State in the Interest of A.M.** refers to an earlier version of Louisiana Children's Code article 897.1, the text of the article has not been changed to the extent that would suggest that the juvenile court does not have discretion in determining the term of commitment.

discretion. **State in Interest of C.T.**, 2015-1864 (La. App. 1st Cir. 4/15/16), 195 So.3d 70, 76, <u>affirmed</u>, 2016-0939 (La. 10/18/17), 236 So.3d 1210 (per curiam).

Herein, at the disposition hearing, Harbison testified that he was assigned to T.B.'s case on August 5, 2019. He further stated that at that time, T.B.'s needs were to address his substance abuse, specifically marijuana use, and his school and counseling needs. He testified that the services that were put into place, including substance abuse treatment with Turning Point Family and Community Services, a referral to National Child and Family Services (NCFS), and a GPS monitor, were unsuccessful. He noted that in regard to substance abuse, the Turning Point representative was unable to contact T.B.'s family to initiate services. Regarding the NCFS referral, he noted that those services were never initiated due to T.B.'s arrest for the instant offense. To his knowledge, T.B. was not enrolled in school at the time of the instant offense.[16] Harbison agreed that T.B. needs a structured environment to acquire the necessary services.

The juvenile court referred to La. Ch. Code art. 903 in determining the appropriate time period that the youth should be committed to the state in this case. The court noted that T.B. was a third time offender, that he was under OJJ supervision at the time he committed the current offense, and that he had multiple arrests in addition to his adjudications. The court also stated that T.B. underwent a psychological evaluation on August 20, 2019, but that the recommendations from that evaluation were not accomplished. The court also noted that T.B.'s prior crimes consist of property offenses and that he had not, prior to the instant offense, committed a crime of violence.

After also considering the facts of the instant offense, the juvenile court imposed a commitment of twenty-four months and ordered OJJ to take custody of

---

[16] According to the supplemental predisposition report, during the beginning of the 2019-2020 school year, T.B. was enrolled at school in the ninth grade. T.B. accumulated more than ten unexcused absences from school and one disciplinary referral. Thereafter, T.B.'s mother reported that she was going to enroll him at another school but never did so.

T.B. within fourteen days. The court noted that T.B. would be placed in secure custody and would be eligible for parole consideration after completing two-thirds of his term, further noting that compliance with services would matter in that regard. The court further stated, "Following the rules, it matters, because when you are eligible for parole all of those things are going to be looked at; and so, put yourself in a position that's favorable, that looks and will work for you and not against you." The court ordered OJJ to put into place services to address T.B.'s educational, substance abuse, counseling and family counseling, and employment needs.

In denying the State's motion to reconsider, the juvenile court in part noted that T.B. would have to stay the full term of the disposition and would not be eligible for any modification until he served the minimum of two-thirds of the commitment. The court further noted that T.B. would be nineteen years old at the time of the completion of his disposition. The court stated that the disposition speaks to the needs of T.B.'s rehabilitation and the services that are available within the state institution in order to accomplish that goal. Given the juvenile court's wide discretion in considering dispositional options, we find no manifest abuse of that discretion in this case. The juvenile court considered the circumstances surrounding the incident and considered T.B.'s needs and past services. As the court indicated, T.B. had not previously committed a crime of violence and had not previously been offered services while in a controlled environment. In light of these factors, we find that the disposition imposed by the juvenile court was not illegally lenient. The State's sole assignment of error lacks merit.

**ADJUDICATION AND DISPOSITION AFFIRMED.**

24